# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| KAYI AFFO, ET AL., | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | CIVIL NO. 2:11-cv-482-DBH |
| v. | ) | CONSOLIDATED WITH |
| | ) | CIVIL NO. 2:12-cv-115-DBH |
| GRANITE BAY CARE, INC., | ) | |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS | ) | |

## DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT

The plaintiffs provided care in Maine to clients of Granite Bay Care, Inc. ("Granite Bay Care") with disabilities.  They did so under two job titles—Adult Foster Care Provider ("Provider") and Direct Support Professional.[1]  They have sued Granite Bay Care, a second corporation, and Granite Bay Care's corporate officers and shareholders for unpaid wages and overtime through 2011 under Maine and federal law, on the basis that they worked over 40 hours per week.[2] The two officers/shareholders and the second corporation have moved for summary judgment on all claims on the basis that they were not the plaintiffs'

---

[1] The latter job title changed over the years (e.g., Direct Service Provider and DSP).  Stipulated Facts ¶ 3 (ECF No. 53).  I will use the title in text.

[2] On the defendants' request and without objection, I consolidated case 2:12-cv-115-DBH with 2:11-cv-482-DBH.  See Order (ECF No. 18).  The claims in both cases are essentially the same. Both cases have a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) (unpaid wages) (Count I), and under Maine law, 26 M.R.S.A. §§ 664 (minimum wage and overtime) and § 670 (employee remedies) (Count II).  In case 2:11-cv-482-DBH, Kayi Affo also has a claim based on a specific demand she made of Granite Bay Care for payment of wages earned during employment, 26 M.R.S.A. § 626 (former employees can seek unpaid wages after demand of payment) (Count III).

"employers" under either federal or state law; the plaintiffs have moved for summary judgment on the proposition that both corporations were employers.[3] I grant the second corporation's motion on all claims and deny the plaintiffs' motion. I grant the individual defendants' motion on the state claim, but deny it on the federal claim. Both corporations and the two individual defendants also have moved for summary judgment on the federal claim, on the basis that they relied in good faith on a Department of Labor ruling or interpretation. I deny that motion. The plaintiffs have moved for summary judgment on their state law claim against all the defendants. I grant that motion as against Granite Bay Care.

The triable issues remaining are liability on the federal claim, whether the individuals can be treated as employers under federal law, and damages.

### UNDISPUTED FACTS GENERALLY[4]

At all relevant times, Granite Bay Care was a for-profit business that provided residential services for persons with mental disabilities. Stipulated Facts ¶¶ 38, 40, 43 (ECF No. 53). Kasai Mumpini and Caroletta Alicea were its only shareholders and corporate officers. Defs.' Statement of Material Facts

---

[3] Although the plaintiffs state their belief that the undisputed facts "are enough for the Court to conclude that as a matter of law" the two individuals were the plaintiffs' employers, Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. at 6 (ECF No. 67), they have not made a motion to that end and the plaintiffs subsequently state in the same brief that there is a "basis to conclude that there is a genuine dispute of material fact" as to whether the individuals were employers, id. at 7. Given the ambiguity of these statements, and given that the plaintiffs explicitly request summary judgment on the question of whether the other corporation was their employer, id. at 10, I do not treat them as having moved for summary judgment against the individual defendants.

[4] I will recount additional undisputed facts that are pertinent to a particular motion when I deal with that motion. Where there is a dispute, I view the disputed fact in the light favorable to the nonmoving party.

2

("DSMF I") ¶ 5 (ECF No. 62); Pls.' Statement of Material Facts in Opp'n to Defs.' Statement of Material Facts ("Pls.' Resp. I") ¶ 5 (ECF No. 68).   Granite Bay Care's purpose was "to assist individuals with disabilities to realize their fundamental right to obtain their goals and enhance their quality of life." Stipulated Facts ¶ 38.   Granite Bay Care provided care and support by setting up private homes for the disabled individuals.   Stipulated Facts ¶ 17.   To carry out its purpose, Granite Bay Care engaged various categories of personnel— among them, Adult Foster Care Providers, Direct Support Professionals, and Respite Workers.   Stipulated Facts ¶ 41.

Granite Bay Connections, Inc., was a nonprofit entity that provided comparable services in New Hampshire.   DSMF I ¶ 11; Pls.' Resp. I ¶ 11.   (To distinguish it from Granite Bay Care, I will refer to it as "Granite Bay New Hampshire.")   Mumpini and Alicea were also officers and directors of that nonprofit corporation.   Id.

Granite Bay Care compensated Providers by a stipend.   Stipulated Facts ¶ 5.   The Provider contracts required that the Providers be responsible for the care of the disabled client twenty-four hours per day, five days per week between Sunday at 4:00 p.m. and Friday at 4:00 p.m.   Stipulated Facts ¶¶ 2, 34.   Granite Bay Care provided "Respite Workers" for the remaining period of time (between Friday at 4:00 p.m. and Sunday at 4:00 p.m.) unless the Provider remained in the home with the client over the weekend.   Stipulated Facts ¶ 4.   The Direct Support Professionals, on the other hand, worked Mondays to Fridays, 8 a.m. to 4 p.m., and Granite Bay Care paid them by the

3

hour. Stipulated Facts ¶¶ 3, 7.  Granite Bay Care did not require Providers to work as Direct Support Professionals, but gave them the option to do so. Stipulated Facts ¶ 3.  These plaintiffs served in both roles.  Stipulated Facts ¶ 33.

**ANALYSIS**

In Part I, I deal with the argument of some defendants that they cannot be liable because they were not the plaintiffs' employer. In Part II, I determine whether the defendants have an affirmative good faith defense to federal liability.  In Part III, I deal with whether the plaintiffs have established liability on their state law claim.

**I.      *Were Mumpini, Alicea, and Granite Bay New Hampshire Employers and Therefore Liable Under Federal or State Law?***

    **A.      *The Individuals Kasai Mumpini and Caroletta Alicea***

        **(1)      *Federal Fair Labor Standards Act ("FLSA") Claim***

To establish liability on their FLSA claim, the plaintiffs must show that a particular defendant that they are suing is their employer.  29 U.S.C. § 207. The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

The First Circuit has observed that "[t]aken literally this [section 203(d) definitional] language would support liability against any agent or employee with supervisory power over other employees." Donovan v. Agnew, 712 F.2d 1509, 1510 (1st Cir. 1983).  But the First Circuit also said that it would not lightly infer that the conventional corporate shield to personal liability should be disregarded, and that it was "difficult to accept . . . that Congress intended

that any corporate officer or other employee with ultimate operational control over payroll matters be personally liable . . . ." Id. at 1513.   Instead, Agnew adopted an "economic reality" approach to who is an employer under the FLSA. Id. at 1514.   Agnew found FLSA liability for "corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of nonpayment."   Id. (citation omitted). Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 677 (1st Cir. 1998), confirmed the Agnew approach.   Baystate said that the facts in Agnew "relevant to the personal liability determination" were (1) "the significant ownership interest of the corporate officers"; (2) "their operational control of significant aspects of the corporation's day to day functions, including compensation of employees";[5] and (3) "the fact that they personally made decisions to continue operating the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees."   Id. at 677-78.   The First Circuit continued this approach once again in Chao v. Hotel Oasis, Inc., 493 F.3d 26 (1st Cir. 2007).

---

[5] One of the officers was "personally responsible for allowing the company's workers' compensation insurance to lapse . . ., and he personally took responsibility for making banking arrangements when informed that the company's payroll account could not cover its weekly payroll"; the other "personally supervised the company's cash flow, was personally involved in decisions about layoffs and employee overtime hours, and met frequently with the union president about the company's failure to make payments to the employees' pension plan, health insurance plan, and workers' compensation program."   Baystate, 163 F.3d at 677-78 n.12.

Agnew makes ownership a factor, but does not specify how important it is.  Other circuits say that alone it is not enough and that neither ownership nor ultimate authority is determinative.  See, e.g., Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1161 (11th Cir. 2008) (president/majority shareholder not an employer because he was not involved in the supervision, hiring, firing, or compensation of employees; even if president could have played a greater role in day-to-day operations, "unexercised authority is insufficient to establish liability as an employer" (citation omitted)); Patel v. Wargo, 803 F.2d 632, 638 (11th Cir. 1986) (president/majority shareholder not "involved in the day-to-day operation of the facility," regardless of whether he "might have played a greater role" given his status as president); Wirtz v. Pure Ice Co., 322 F.2d 259, 262-63 (6th Cir. 1963) ("There is little question from the record but what Thompson as the majority stockholder and dominant personality in Pure Ice Company, Inc., could have taken over and supervised the relationship between the corporation and its employees had he decided to do so.  A careful reading of the record, however, indicates that he did not do so.").

On the control factor, Agnew and its progeny focus on the day-to-day operational control that corporate officers directly and personally exercise (as opposed to ultimate operational control that a president/CEO routinely has by virtue of the office).  See, e.g., Agnew, 712 F.2d at 1511, 1514 ("directly involved in decisions affecting employee compensation"; "operational control of significant aspects of the corporation's day to day functions"); Baystate, 163

6

F.3d at 678 ("authority to manage certain aspects of the business's operations on a day-to-day basis"; "personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act"); Hotel Oasis, 493 F.3d at 34 ("corporate officer principally in charge of directing employment practices"); see also Alvarez Perez, 515 F.3d at 1160 ("[I]n order to qualify as an employer for this purpose, an officer 'must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee.'" (quoting Patel, 803 F.2d at 638)); Wirtz, 322 F.2d at 263 ("That he might have taken over and acted . . . in the interest of an employer (the corporation) in relation to an employee' is beside the point as long as he did not do so.").

On the third factor, the First Circuit concerns itself with who was "instrumental in 'causing' the corporation to violate the FLSA." Hotel Oasis, 493 F.3d at 34 (citations omitted); see also Baystate, 163 F.3d at 678 ("the personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act"); Agnew, 712 F.2d at 1514 ("who personally made decisions to continue operations despite financial adversity during the period of nonpayment" (citation omitted)).

I now address each of these three factors in turn, recounting the undisputed facts relevant to each of the legal principles.

### (i)     Ownership

This factor requires relatively little discussion.  Mumpini and Alicea were Granite Bay Care's sole shareholders and corporate officers.  DSMF I ¶ 5; Pls.'

Resp. I ¶ 5.  Although the cases discussed above indicate that mere ownership status alone does not suffice to establish personal liability as an employer, this factor nevertheless militates toward a finding of personal liability.

### (ii)    Day-to-Day Operational Control

Mumpini and Alicea employed a State Director for Granite Bay Care. Pls.' Additional Statement of Material Facts ("PASMF I") ¶ 2 (ECF No. 68); Defs.' Resp. to Pls.' Additional Statement of Material Facts ("Defs.' Resp. I") ¶ 2 (ECF No. 84).  The State Director answered only to Mumpini and Alicea.  PASMF I ¶ 1; Defs.' Resp. I ¶ 1.  He had authority to manage all aspects of Granite Bay Care's business, including personnel and compensation decisions, subject to Mumpini's and Alicea's advice and consent.  DSMF I ¶ 6; Pls.' Resp. I ¶ 6.  He made all operational and managerial decisions involving Granite Bay Care's daily operations.  DSMF I ¶ 9; Pls.' Resp. I ¶ 9.[6]  He kept Mumpini and Alicea informed of the daily management of Maine operations, relaying that information through daily e-mails and communications, as well as at in-person meetings each Monday, and at monthly director and executive management meetings at which he informed Mumpini and Alicea of staff hiring and firing decisions.  PASMF I ¶¶ 5, 38; Defs.' Resp. I ¶¶ 5, 38.  He forwarded to them

---

[6] The plaintiffs deny this assertion, stating that the State Director acted with Mumpini's and Alicea's advice and consent, that the sole persons to whom he answered were Mumpini and Alicea, and that Mumpini and Alicea had the full right to exercise their authority as to compensation of Granite Bay Care staff.  Pls.' Resp. I ¶ 9.  I accept the advice and consent qualification, but it does not contradict the State Director's testimony as to his general role. The fact that he answered ultimately to Mumpini and Alicea, on which the parties agree, does not diminish his responsibility for daily operational decisions.  Finally, although Alicea testified that she believed that she and Mumpini had authority over compensation decisions, she proceeded to clarify that that decision-making authority was ceded to the State Director. Caroletta Alicea Dep. Sept. 12, 2012 ("Alicea Dep. II") 35:21-37:3 (ECF No. 62-4).  The plaintiffs' complete denial is therefore unsupported by the record.

8

everything that he ever did.  PASMF I ¶ 8; Defs.' Resp. I ¶ 8.  He informed them of the details of state funding, staff compensation models, and changes that he had proposed in Medicaid funding requests to the State of Maine, as well as the financial impact of certain issues, responding on at least one occasion to a request for financial information.  PASMF I ¶ 9; Defs.' Resp. I ¶ 9.

Mumpini periodically issued memoranda to Granite Bay Care staff with respect to mandated reporting obligations, disaster protocols, professional attire, and change from bimonthly to monthly payment of stipends.  PASMF I ¶ 19; Defs.' Resp. I ¶ 19.  The State Director initiated and prepared certain of the communications issued in Mumpini's name.  DSMF I ¶ 38; Pls.' Resp. I ¶ 38.  He, rather than Alicea or Mumpini, dealt with Granite Bay Care's attorney on issues regarding compensation and the Department of Labor.  DSMF I ¶ 35; Pls.' Resp. I ¶ 35.  Mumpini never reviewed agendas for Granite Bay Care's executive management meetings because he did not run the meetings.  DSMF I ¶ 41; Pls.' Resp. I ¶ 41.

I conclude that this Agnew factor favors the defendants.  Although there was an approval structure in place by which Mumpini and Alicea could monitor the company's finances, although Mumpini held the ultimate authority inherent to his position as president and CEO, and although the State Director kept them fully informed, the plaintiffs have failed to establish that the owners *exercised* daily operational control or were directly and personally involved in

day-to-day compensation decisions.[7]   Mumpini, Alicea, and the State Director himself all testified that the State Director had full authority over the company's day-to-day operations, including employment and compensation matters, and that Mumpini and Alicea were not involved in those decisions. Although the State Director met with Mumpini and Alicea in monthly executive management meetings, he testified that the meetings were not directive, and the plaintiffs have identified no evidence to the contrary; indeed, the parties agree that Mumpini did not run these meetings.   And while Mumpini sometimes issued memoranda to Granite Bay Care staff (some of which were actually prepared by the State Director in Mumpini's name), that indicates at best an occasional involvement insufficient to call into question the State Director's role as the primary day-to-day decision-maker.

The evidence thus fails to show that the owners had *day-to-day* involvement in Granite Bay Care's operations, and only reveals the kind of ultimate supervisory authority inherent to ownership.

### *(iii)    Role in Causing FLSA Violation*

As president and CEO, Mumpini had the ultimate decision on Granite Bay Care's staffing systems.   PASMF I ¶ 4; Defs.' Resp. I ¶ 4.   When Granite

---

[7] Much of the plaintiffs' argument about Mumpini's and Alicea's role rests on the State Director's statement that he acted with the "advice and consent" of Mumpini and Alicea.   But the plaintiffs have removed that remark from its immediate context: at the State Director's deposition, that statement was immediately preceded by testimony that the monthly meetings with them were not directive and that they rarely edited his work.   <u>See</u> Gregory Robinson Dep. July 18, 2012 ("Robinson Dep. I") 121:24-122:2 (ECF No. 62-10).   Therefore, the State Director's testimony regarding the "advice and consent" of Mumpini and Alicea does not demonstrate direct day-to-day oversight so much as it simply reflects the inherent authority of ownership, which alone is not enough.

Bay Care was formed, Mumpini and Alicea decided to use the same staffing model that Granite Bay New Hampshire already used, with Adult Foster Care Provider, Direct Support Professional, and Respite Worker positions.  PASMF I ¶¶ 12, 14; Defs.' Resp. I ¶¶ 12, 14.[8]  They authorized Granite Bay Care management to use the Adult Foster Care Provider contracts with staff.  PASMF I ¶ 16; Defs.' Resp. I ¶ 16.[9]  As a result, at its inception Granite Bay Care compensated Adult Foster Care Providers and Respite Workers by stipend as independent contractors and compensated Direct Support Professionals on an hourly basis as employees.  PASMF I ¶ 15; Defs.' Resp. I ¶ 15.[10]  From 2006 to 2011, although Alicea and Mumpini did not have an ongoing discussion about whether Granite Bay Care staff would be paid by stipend or by the hour, the State Director discussed this issue with them at different times.  DSMF I ¶ 31; Pls.' Resp. I ¶ 31.

---

[8] The defendants qualify these assertions by the plaintiffs and state that while Alicea testified that the owners decided to use this arrangement, the State Director testified that he was given discretion and authority to implement operations in Maine as he deemed appropriate.  Defs.' Resp. I ¶¶ 12, 14; Robinson Dep. I 11:12-13:6 (ECF No. 84-6).  The defendants also point to deposition testimony from Mumpini that Mumpini had no involvement in setting employment and personnel policies and that his role was simply to guide the organization and assess what he called the "overall picture."  Defs.' Resp. I ¶ 14; Kasai Mumpini Dep. Aug. 17, 2012 ("Mumpini Dep. I") 20:23-21:1, 57:1-58:22 (ECF No. 84-4).  I accept the defendants' qualification, but it does not contradict the fact that Mumpini and Alicea decided at the outset to use the staffing model in question.

[9] The defendants qualify this assertion and state that while Alicea indicated that she authorized use of the contract, the State Director had the authority to make day-to-day decisions, including contract decisions.  Defs.' Resp. I ¶ 16; Mumpini Dep. I 49:24-52:3 (ECF No. 62-7).  Again, I accept the qualification, but the State Director's day-to-day authority does not contradict the fact that Mumpini and Alicea made the initial decision.

[10] The defendants qualify the plaintiffs' assertion that "the owners authorized the compensation scheme," PASMF I ¶ 15, pointing again to the State Director's testimony as to his discretion as well as to testimony from Alicea that she did not personally make any decisions regarding employee compensation, stipend payments to be made to Adult Foster Care Providers, or other personnel policies.  Defs.' Resp. I ¶ 15; Robinson Dep. I 11:12-13:6 (ECF No. 84-6); Alicea Dep. II 34:17-35:12 (ECF No. 62-4).  Once again, I accept the defendants' qualification, but it does not contradict the fact that the compensation scheme resulted from Mumpini's and Alicea's original decision.

In 2006, the State Director provided Mumpini and Alicea with information on comparative costs of compensating Provider staff by stipend and by the hour, and he decided to change the compensation of Respite Workers to an hourly pay rate and to treat the Respite staff in the future as employees, a decision that Mumpini and Alicea supported.  PASMF I ¶ 21; Defs.' Resp. I ¶ 21.[11]   When the United States Department of Labor raised issues over Granite Bay Care's staff compensation policy in 2007, the State Director discussed the policy with Mumpini and Alicea, and kept them updated on the Department of Labor's actions and on communications from Granite Bay Care's attorney.   DSMF I ¶ 23; Pls.' Resp. I ¶ 23; PASMF I ¶ 22; Defs.' Resp. I ¶ 22.   After the Department of Labor concluded that Respite Workers were not exempt from overtime requirements, Mumpini and Alicea approved Granite Bay Care's agreement to pay the overtime wages that the Department of Labor informed them were owed.  PASMF I ¶¶ 31-32; Defs.' Resp. I ¶¶ 31-32. Alicea believed that they had no choice but to do what the Department of Labor told them.  PASMF I ¶ 32; Defs.' Resp. I ¶ 32.

In 2010, Granite Bay Care's State Director informed Mumpini and Alicea of pending Maine Department of Health and Human Services ("DHHS") cuts to the room-and-board subsidy paid to Granite Bay Care.  PASMF I ¶ 25; Defs.'

---

[11] The plaintiffs state that the State Director "proposed" this change to Mumpini and Alicea and that they "agreed" to it, citing the State Director's deposition testimony.  PASMF I ¶ 21; Gregory Robinson Dep. Sept. 12, 2012 ("Robinson Dep. II") 21:5-9 (ECF No. 62-11).   However, the defendants qualify this statement and point out that the State Director immediately provided the following qualification in his deposition: "I think it's better to say that I had made the decision and they supported it.   That's not semantics."  Robinson Dep. II 21:10-12 (ECF No. 62-11).   I construe any conflict in these statements in the plaintiffs' favor, but it makes no difference to the outcome.

Resp. I ¶ 25.  Mumpini asked him to provide a comprehensive review of room-and-board subsidies and provider contract details.  PASMF I ¶ 26; Defs.' Resp. I ¶ 26.  He did so, informing Mumpini and Alicea that the bottom line percentage cut in the room-and-board subsidy was 22.5 percent.  PASMF I ¶¶ 26-27; Defs.' Resp. I ¶¶ 26-27.  Mumpini and Alicea requested that the overall loss from the DHHS reduction be made up in other areas, and that an overall percentage of funds be maintained.  PASMF I ¶ 28; Defs.' Resp. I ¶ 28.[12] Prior to proposing changes in the staffing and compensation model for caregiving staff to DHHS, the State Director informed Mumpini and Alicea of the details of the proposed new staffing model.  PASMF I ¶ 29; Defs.' Resp. I ¶ 29.

Also in 2010, the United States Department of Labor informed Granite Bay Care that it owed overtime wages to Adult Foster Care Providers.  PASMF I ¶ 33; Defs.' Resp. I ¶ 33.  Granite Bay Care's State Director subsequently provided Mumpini and Alicea with materials comparing the respective costs of compensating staff by stipend and by the hour.  PASMF I ¶ 34; Defs.' Resp. I ¶ 34.  (The State Director had previously presented Mumpini and Alicea with cost comparisons of different staff compensation models in 2006 and 2008.

---

[12] The plaintiffs allege both that Mumpini and Alicea "decided" that the DHHS cuts would be passed on to Adult Foster Care Providers and that they "requested" that an overall percentage of funds be maintained, an assertion that the defendants qualify.  PASMF I ¶ 28; Defs.' Resp. I ¶ 28.  The State Director never testified that Mumpini and Alicea "decided" to pass on the cuts, but in an e-mail, he did mention that they "requested" that an overall percentage of funds be maintained.  Robinson Dep. Ex. 25 at 1 (ECF No. 77-4).  At his deposition, he testified that he had supplied Mumpini and Alicea with the percentage figure and that it was "poor wording" to state in the e-mail that they had "requested" that figure.  Robinson Dep. II 48:10-49:4 (ECF No. 62-12).  But viewing the facts in the light most favorable to the plaintiffs, the State Director's e-mail nevertheless raises a genuine question as to whether the owners requested the percentage figure, and I therefore state the fact most favorably to the plaintiffs.

PASMF I ¶ 37; Defs.' Resp. I ¶ 37.)   Alicea testified that in 2010 she began looking into changing the method of compensation and that she eventually decided to change staff compensation to an hourly rate of pay.  PASMF I ¶¶ 33, 35; Defs.' Resp. I ¶¶ 33, 35.[13]

Thus, although I have concluded that Alicea and Mumpini were not involved in the quotidian operations of Granite Bay Care, the evidence is sufficient to raise factual questions as to their role in causing the FLSA violations asserted in this lawsuit.   They may have delegated the daily operational decisions to the State Director, but triable questions remain as to their role in some of the more momentous decisions regarding the company's compensation model.   The plaintiffs have introduced evidence that Mumpini and Alicea were not merely aware of Granite Bay Care's staffing model, but that they in fact made the decision to use that model in Maine, *i.e.,* authorized Granite Bay Care management to enter into Adult Foster Care Provider contracts with staff.   Even accepting the defendants' qualification that the State Director had authority and discretion to change the compensation

---

[13] The defendants qualify the plaintiffs' assertions that Alicea and Mumpini "began looking into" changing compensation methods and that they "decided" to change compensation. PASMF I ¶¶ 33, 35; Defs.' Resp. I ¶¶ 33, 35.  As the defendants note, the plaintiffs' first assertion is based on Alicea's affirmative response to the following question: "As a result of that, the position that U.S. Department of Labor was taking, did you start looking at changing the way you paid Adult Foster Care Providers?"  Caroletta Alicea Dep. Aug. 17, 2012 ("Alicea Dep. I") 58:7-10 (ECF No. 62-3).  Although the defendants further point out that Alicea proceeded to explain that the State Director provided the comparative data and decided the method of compensation, Alicea's response is sufficient to create a genuine dispute as to whether she looked into changing the method of compensation.  Similarly, Alicea answered affirmatively the question, "Did you—you decided that you would pay them by the hour instead of by a stipend?"  Alicea Dep. I 60:1-6 (ECF No. 62-3).  Although the defendants point out that Alicea elsewhere stated that the State Director "did all of that calculating and work" regarding the compensation change, Alicea Dep. I 59:17-21 (ECF No. 62-3), Alicea's testimony is at least ambiguous, and I view the ambiguity in the light most favorable to the plaintiffs.

scheme, that does not refute the basic fact that the original decision was that of Mumpini and Alicea, not the State Director.   In other words, they had "personal responsibility for making decisions about the conduct of the business that contributed to the violations of the [FLSA]" if they made the decision to implement the very compensation scheme at issue here.  Baystate, 163 F.3d at 678.

Furthermore, even though I have concluded that the plaintiffs have not shown evidence that Mumpini and Alicea were involved in the day-to-day operations of Granite Bay Care, they have pointed to several instances of involvement at significant junctures.  In 2007, Mumpini and Alicea approved the payment of overtime wages to Respite Workers following a Department of Labor investigation.   In 2010, they requested that a specified percentage of funds be maintained in the wake of DHHS cuts.   Perhaps most significantly, Alicea's deposition testimony is at least ambiguous as to whether it was they who made the decision to change staff compensation following the second Department of Labor investigation in 2010.

That is more than enough to raise genuine questions as to whether Mumpini and Alicea made the business decisions resulting in the FLSA violations asserted here.   Thus, even though the second Agnew factor favors them due to their lack of daily involvement, a factfinder still might conclude that Mumpini and Alicea were "employers" within the ambit of the FLSA due to their ownership interest and their role in implementing the compensation scheme that assertedly violates the FLSA.  See Hotel Oasis, 493 F.3d at 34

("instrumental in 'causing' the corporation to violate the FLSA").   I therefore deny Mumpini's and Alicea's motion for summary judgment.

### (2)   *Maine Law Claim*

Unlike the FLSA, Maine's wage and hour law does not define the term "employer," and the parties dispute whether an individual supervisor can ever be held liable as an employer.  On the one hand, Maine's Law Court has stated that in interpreting Maine's wage and hour law, when "a term is not defined in either the relevant statutory provisions or in prior decisions of this court, Maine Courts may look to analogous federal statutes, regulations, and case law for guidance."  Gordon v. Me. Cent. R.R., 657 A.2d 785, 786 (Me. 1995) (citation omitted).  Indeed, the Law Court has held that in applying Maine's statute, a trial court did not err in analogizing to FLSA caselaw on employer status (including Agnew) and in holding various interrelated corporate entities liable as "joint employers" under an "economic reality" analysis.  Dir. of the Bureau of Labor Standards v. Cormier, 527 A.2d 1297, 1299-1300 (Me. 1987).

But on the other hand, the First Circuit has consistently recognized the extraordinarily broad scope of FLSA coverage.  In Bayside, for instance, the First Circuit noted that the FLSA's definitions of "employ," "employer," and "employee"

> "[are] comprehensive enough to require [their] application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category."  Moreover, the remedial purposes of the FLSA require courts to define "'employer' more broadly than the term would be interpreted in traditional common law applications."

163 F.3d at 675 (citations omitted).  Maine's wage and hour law was enacted in 1959, over two decades after the FLSA, and Maine's definitions of "employee" and "employ" closely track those of the FLSA.  Compare 26 M.R.S.A. §§ 663(2), and 663(3), with 29 U.S.C. §§ 203(g), and 203(e).  Some provisions of the Maine statute expressly incorporate FLSA standards.  See, e.g., 26 M.R.S.A. §§ 664(1) (keying Maine minimum wage to federal minimum wage) & 664(3) (for purposes of overtime pay, "[t]he regular hourly rate . . . does not include any sums excluded from the definition of 'regular rate' under the Fair Labor Standards Act").  In contrast, the Maine legislature did *not* adopt the FLSA definition of "employer," a definition that the First Circuit found remarkably broad in Agnew.

Although the Law Court did rely on Agnew and its "economic reality" analysis in upholding joint employer liability for multiple corporations in Cormier, extending liability to individual shareholders and officers represents a far more drastic step.  Doing so would run counter to the general principle that "'corporations are separate legal entities with limited liability,'" a principle that leaves Maine courts "'generally reluctant to disregard the legal entity.'" Johnson v. Exclusive Props. Unlimited, 720 A.2d 568, 571 (Me. 1998) (citations omitted).  The plaintiffs have not shown the abuse of the corporate form and unjust or inequitable consequences necessary to pierce the corporate veil and hold individual shareholders liable.  See id. (recognizing "two common elements that a plaintiff must establish before a court will disregard the corporate entity: (1) some manner of dominating, abusing, or misusing the corporate form; and

(2) an unjust or inequitable result that would arise if the court recognized the separate corporate existence" (citations omitted)).[14]

Given both the Maine legislature's silence on the definition of "employer" and the reluctance of Maine courts to hold shareholders individually liable, I decline to extend liability under Maine's wage and hour law to individual shareholders and officers.[15]

### B.    *Granite Bay New Hampshire*

I recount additional undisputed facts that bear on whether Granite Bay New Hampshire was an employer of these Maine plaintiffs.[16]

Mumpini and Alicea, the directors of the profit-making Granite Bay Care, were also the directors of Granite Bay New Hampshire, a nonprofit that provided in New Hampshire services comparable to those that Granite Bay Care provided in Maine.  DSMF I ¶ 11; Pls.' Resp. I ¶ 11; PASMF I ¶¶ 40-41; Defs.' Resp. I ¶¶ 40-41.   In structuring Granite Bay Care, the Maine State Director simply copied the Adult Foster Care Provider staffing model already used in New Hampshire.  PASMF I ¶ 13; Defs.' Resp. I ¶ 13.  He received a copy

---

[14] The same holds true under the law of New Hampshire, the state in which Granite Bay Care was incorporated.  New Hampshire courts pierce the corporate veil and impose individual liability "where the corporate identity has been used to promote an injustice or fraud, where a defendant has suppressed the fact of incorporation, and where an individual expressly agrees to personal liability for a corporation's debts."  Gautschi v. Auto Body Discount Ctr., Inc., 660 A.2d 1076, 1079 (N.H. 1995) (citations omitted).  The plaintiffs have not alleged any of those circumstances.

[15] I recognize, however, that this is a close question and that Maine caselaw provides only partial guidance, so that the issue may ultimately need to be resolved by certification to the Law Court.

[16] Both Granite Bay New Hampshire and the plaintiffs have moved for summary judgment on this question.  Rather than alternately viewing the facts in the light most favorable to the nonmovant on each of the two motions, I set forth the facts below in the light most favorable to the plaintiffs.  Since I conclude that Granite Bay New Hampshire is entitled to summary judgment even on that version of the facts, I need not separately assess the facts for purposes of the plaintiffs' motion for summary judgment.

of the personnel handbook used by Granite Bay New Hampshire, adapted it to Maine, and later revised it in conjunction with Granite Bay Care's executive management (*i.e.*, all of the people under his direction), although not with Mumpini and Alicea.  DSMF I ¶ 40; Pls.' Resp. I ¶ 40; Gregory Robinson Dep. Sept. 12, 2012 ("Robinson Dep. II") 8:21-9:3 (ECF No. 62-11).  During the first six months of Granite Bay Care's existence from 2004 to 2005, Granite Bay New Hampshire provided support staff to Granite Bay Care, namely a payroll administrator who provided joint oversight.  PASMF I ¶¶ 42-43; Defs.' Resp. I ¶¶ 42-43.[17]  The management of both companies held monthly joint executive strategic planning meetings with Mumpini and Alicea.  PASMF I ¶ 44; Defs.' Resp. I ¶ 44.

But separate State Directors managed the companies' daily operations, and these separate State Directors made all the decisions on personnel and compensation for their respective companies.  DSMF I ¶ 12; Pls.' Resp. I ¶ 12. Each company had exclusive responsibility over its own employees and contractors, and had the power to hire, promote, discipline, and terminate its own employees but not the employees or contractors of the other company.

---

[17] The plaintiffs state more categorically that "Granite Bay [New Hampshire] management provided Granite Bay Care with support in completing payroll," a statement that Granite Bay New Hampshire qualifies.  PASMF I ¶ 43; Defs.' Resp. I ¶ 43.  I accept the qualification.  The testimony cited by the plaintiffs shows that the payroll administrator provided payroll support only for the first six months of Granite Bay Care's existence, after which Granite Bay Care hired its own business coordinator, Robinson Dep. I 16:17-17:7 (ECF No. 74), and that Granite Bay Care employees subsequently handled Granite Bay Care's payroll, Robinson Dep. I 22:5-18 (ECF No. 74).  Therefore, the plaintiffs have failed to raise a triable issue as to whether Granite Bay New Hampshire provided support for the entirety of Granite Bay Care's existence; the record only shows that Granite Bay New Hampshire provided support for the first six months of Granite Bay Care's existence.

DSMF I ¶ 45; Pls.' Resp. I ¶ 45.[18]   Each company individually supervised and controlled the work schedules, conditions, and contractual terms of its respective employees and contractors, but not those of the other company's employees or contractors.   DSMF I ¶ 46; Pls.' Resp. I ¶ 46.[19]   Each entity individually determined the rate and method of compensation of its own employees and contractors, but not those of the other entity's employees and contractors.   DSMF I ¶ 47; Pls.' Resp. I ¶ 47.   The companies independently and separately handled human resource matters and decisions, and maintained separate files, records, and contracts pertaining to their employees, contractors, and business operations.   DSMF I ¶¶ 47-48; Pls.' Resp. I ¶¶ 47-48.[20]   The two corporations were not required to coordinate with one another

---

[18] The plaintiffs deny this statement and respond that the two corporations had joint contracts with staff, enforceable by either corporation.  Pls.' Resp. I ¶ 45.  As evidence, they point to the non-disclosure, non-competition, and non-disparagement contract signed by Sharon McCarron, an Adult Foster Care Provider, which designated as parties to that contract both Granite Bay Care and Granite Bay New Hampshire.  Contract of Sharon McCarron at 840 (ECF No. 53-1).  I address this contract at greater length below.  In any event, even if the presence of Granite Bay New Hampshire in this contract was not just a "typo" as Alicea and Mumpini claim, Defs.' Resp. I ¶ 45; Alicea Dep. I 18:6-24 (ECF No. 84-1); Mumpini Dep. I 17:3-18:7 (ECF No. 62-7), the status of Granite Bay New Hampshire as a party to this non-disclosure, non-competition, and non-disparagement agreement does not establish that Granite Bay New Hampshire had the power to discipline or terminate the plaintiffs for anything other than a violation of this particular agreement.

[19] The plaintiffs deny this assertion, pointing again to the non-disclosure, non-competition, and non-disparagement contract; but the designation of Granite Bay New Hampshire as a party to that agreement does not raise factual questions as to Granite Bay New Hampshire's control and supervision over anything other than the subject matter of that particular agreement.

[20] The plaintiffs qualify these assertions and state that both entities had joint monthly strategic planning meetings and that both were contracting parties with the plaintiffs.  Pls.' Resp. I ¶¶ 47-48.  The non-disclosure, non-competition, and non-disparagement agreement does not raise factual questions as to anything outside of its particular subject matter, for the same reasons discussed in the preceding footnotes, nor is its existence probative of whether or not the companies maintained separate files.  As for the monthly meetings, the portion of the State Director's deposition testimony cited by the plaintiffs, Robinson Dep. I 121:9-16 (ECF No. 74), establishes only that "key individuals from both companies" were present at the monthly strategic planning meetings.  The testimony does not establish that human resources matters were discussed at these meetings, let alone that representatives of one company handled the
*(continued next page)*

on any decisions.  DSMF I ¶ 50; Pls.' Resp. I ¶ 50.  Granite Bay Care supported its own business, financial, human resources, and operational needs on its own, and did not rely on Granite Bay New Hampshire for support beyond the first six months of its existence.  DSMF I ¶ 51; Pls.' Resp. I ¶ 51.[21]

The plaintiffs generally viewed Granite Bay Care as their employer, and did not have a firm understanding of what Granite Bay New Hampshire was. DSMF I ¶ 52; Pls.' Resp. I ¶ 52.  However, the plaintiffs signed non-disclosure, non-competition, and non-disparagement agreements that named both Granite Bay Care and Granite Bay New Hampshire as a contracting party ("Vendor") and stated, "Provider has requested that . . . Vendor pay Employee a bi-monthly stipend for the services performed by Provider as specified in Provider Contract ('Compensation')."  PASMF I ¶ 45; Defs.' Resp. I ¶ 45; Contract of Sharon McCarron at 840 (ECF No. 53-1).[22]  This contract only named Granite

---

human resources issues of the other company.  The plaintiffs' qualification thus fails to raise a factual question as to whether Granite Bay New Hampshire handled human resources matters for Granite Bay Care.

[21] The plaintiffs deny this and state that Granite Bay New Hampshire provided support staff, namely a payroll administrator, to assist with Granite Bay Care's payroll, and that Granite Bay Care adopted the staffing model and employment policies of Granite Bay New Hampshire.  Pls.' Resp. I ¶ 51.  But in the cited portion of his deposition, the Maine State Director testified that the payroll administrator assisted only in the "early days" of Granite Bay Care.  Robinson Dep. I 19:1-6 (ECF No. 84-6).  As for the staffing model, whether or not Granite Bay Care copied the policies of Granite Bay New Hampshire is immaterial to whether Granite Bay New Hampshire provided support to Granite Bay Care.  The plaintiffs' denial is thus unsupported by the record except to the extent that Granite Bay Care received assistance during its first six months.

[22] The defendants deny this statement and point to testimony from Alicea and Mumpini describing the inclusion of Granite Bay New Hampshire as a party to the agreement as a "typo." Defs.' Resp. I ¶ 45; Alicea Dep. I 18:6-24 (ECF No. 84-1); Mumpini Dep. I 17:3-18:7 (ECF No. 62-7).  The plaintiffs do not identify any evidence to the contrary.  Nevertheless, viewing the evidence in the light most favorable to the plaintiffs, I assume for purposes of this motion that Granite Bay New Hampshire was indeed a party to the non-disclosure, non-competition, and non-disparagement agreement.  However, the plaintiffs' assertion that "[i]n consideration of plaintiffs' promises, Granite Bay [New Hampshire] agreed to pay plaintiffs a stipend," PASMF I ¶ 45, is unsupported by the text of the contract itself.  Paragraph 2 of the contract only stated that the Provider "requested" compensation, McCarron Contract at 840; nowhere did that

*(continued next page)*

Bay New Hampshire once, and despite the designation of Granite Bay New Hampshire as a "Vendor," the paragraph titled "Vendor's Business" only described the business of Granite Bay Care in Maine.  McCarron Contract at 840-42.   In signing the contract, the Provider agreed not to breach confidentiality or disparage either corporation, and not to compete in Maine with either corporation.  Id.

### (1)    Federal Law Claim

I have already recounted the FLSA definition of "employer."  Department of Labor regulations expressly contemplate the possibility of a joint employment relationship where an employee "stand[s] in the relation of an employee to two or more employers at the same time" and "employment by one employer is not completely disassociated from employment by the other employer(s)."   29 C.F.R. § 791.2(a).   In that case, "all joint employers are responsible, both individually and jointly, for compliance" with the FLSA.  Id. Does that principle apply here?

In Baystate, the First Circuit held that a temporary staffing agency was a joint employer of temporary workers alongside the agency's client companies, looking "not to the common law conceptions of [the employment] relationship, but rather to the 'economic reality' of the totality of the circumstances bearing on whether the putative employee is economically dependent on [his or her] alleged employer."   163 F.3d at 675 (citation omitted).   The First Circuit

---

contract provide that Granite Bay Care or Granite Bay New Hampshire were responsible to compensate the Provider.

reached its conclusion based on four factors: "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Id. (citation omitted).  Applying those factors, the First Circuit observed that the temporary staffing agency there was "solely responsible for hiring the temporary workers" and "had the power to refuse to send a worker back to a job site where he or she had performed unsatisfactorily"; that the agency "controlled employee work schedules and conditions of employment," and "retained the authority to intervene if problems arose with a worker's job performance"; that it had "unfettered discretion in determining the rate and method of payment" and issued the workers' paychecks; and that it maintained all employment records. Id. at 675-76 (citations omitted).

In this case, all such authority was vested solely in Granite Bay Care, not Granite Bay New Hampshire.  The plaintiffs have pointed to no evidence contradicting the Granite Bay Care Maine State Director's declaration that Granite Bay New Hampshire had no involvement in the hiring, promotion, discipline, and termination of Granite Bay Care employees; that Granite Bay New Hampshire did not interfere with Granite Bay Care's supervision and control of work schedules and conditions; and that Granite Bay Care maintained its own employment and business records.  Furthermore, the parties agree that Granite Bay Care alone determined the rate and method of compensation of its own employees and contractors.

23

The plaintiffs' allegedly contradictory evidence consists of Mumpini's and Alicea's role as directors of both companies; the attendance at monthly strategic planning meetings by key individuals from both companies; the Maine State Director's adoption of the Granite Bay New Hampshire staffing model and personnel handbook for use in Maine; the payroll administrator's joint oversight over payroll matters during the first six months of Granite Bay Care's existence; and the naming of Granite Bay New Hampshire as a party to the non-disclosure/non-competition/non-disparagement contracts that the plaintiffs signed.  I deal with each of those.

By itself, the common role played by Alicea and Mumpini in both companies is of little import to the Baystate factors in assessing whether Granite Bay New Hampshire is the plaintiffs' employer.  Similarly, the fact that key individuals from both companies attended strategic planning meetings with Alicea and Mumpini does not establish that the companies had any authority over one another's employees; the plaintiffs do not point to any evidence indicating that Granite Bay New Hampshire's representatives somehow influenced Granite Bay Care's employment decisions at these meetings.  The Maine State Director's use of the Granite Bay New Hampshire staffing model and handbook may demonstrate that the Granite Bay New Hampshire model was an important influence on his own decision-making as State Director of Granite Bay Care, but it does not suggest that Granite Bay New Hampshire exercised control over Granite Bay Care's employees.  See Cavallaro v. UMass Mem'l Health Care, Inc., 2013 WL 360405, at *8 (D. Mass. Jan. 28, 2013)

("[T]he mere assertion that the corporations followed uniform policies is not sufficient to support any reasonable inference that they exercised control over [plaintiff's] compensation.").

The non-disclosure/non-competition/non-disparagement contracts are not enough to establish Granite Bay New Hampshire as the plaintiffs' employer. The plaintiffs do not point to any testimony contradicting Mumpini's and Alicea's statements that the designation of Granite Bay New Hampshire as a party to those contracts was simply a typographical error.  Their sole evidence consists of the contract language, which only named Granite Bay New Hampshire once.[23]  Even viewing the contracts in the light most favorable to the plaintiffs and assuming the inclusion of Granite Bay New Hampshire was intentional, the plaintiffs do not allege that Granite Bay New Hampshire was a party to their actual employment contracts.[24]  And although the documents in question stated, "Provider has requested that . . . Vendor pay Employee a bi-monthly stipend for the services performed by Provider as specified in Provider Contract ('Compensation')," McCarron Contract at 840, those documents did

---

[23] Furthermore, despite the designation of Granite Bay New Hampshire as a "Vendor," paragraph 1 of the agreement, titled "Vendor's Business," described only the business of Granite Bay Care in Maine, and paragraph 6 limited the "Territory" covered by the non-competition clause to Maine only.  McCarron Contract at 840.

[24] Indeed, Granite Bay New Hampshire was not named in any of the accompanying contracts included in the plaintiffs' exhibit, which enumerated the Adult Foster Care Provider's duties and responsibilities and granted Granite Bay Care the right to terminate the agreement at any time, see McCarron Contract at 848.  The non-disclosure/non-competition/non-disparagement contract seemingly referred to these contracts in paragraph 2: "Provider . . . has further requested that Vendor pay Employee a bi-monthly stipend for the services performed by Provider as specified in Provider Contract ('Compensation')."  McCarron Contract at 840.  Although "Provider Contract" was not defined in the non-disclosure/non-competition/non-disparagement agreement, the reference to "services performed by Provider as specified in Provider Contract," combined with the terms of the accompanying contracts in the plaintiffs' exhibit, shows that the non-disclosure/non-competition/non-disparagement agreement was not itself the contract for the Provider's services.

25

not provide for payment by either corporation.  In short, those documents were neither employment agreements nor guarantees of compensation, and thus do not support the proposition that Granite Bay New Hampshire employed the plaintiffs.

As for the payroll administrator's brief oversight, that does not establish that Granite Bay New Hampshire controlled the compensation and rate and method of payment of Granite Bay Care employees, especially in light of the fact that the parties have elsewhere agreed that Granite Bay Care individually determined the rate and method of compensation of its employees.  DSMF I ¶ 47; Pls.' Resp. I ¶ 47.  In any event, even if this Bayside factor were to tilt slightly in the plaintiffs' favor, it does not alter the outcome, given that the other three factors overwhelmingly favor Granite Bay New Hampshire.

### (2)   *Maine Law Claim*

The plaintiffs ground their Maine law argument in the Law Court's decision in Cormier, which I summarized earlier.  Unlike the First Circuit in Baystate, the Cormier court did not provide a precise formulation for its economic reality determination, noting only that it found "particularly compelling the fact that [one of the corporations] exercises, in effect, overall operational and administrative direction . . . through its centralized management functions."  527 A.2d at 1300.  These functions included the hiring and payment of employees, advertisement of jobs, screening of job applicants, and conducting orientation for new employees.  Id. at 1299.

No such centralized management existed in this case, and nothing in Cormier or subsequent caselaw indicates that the Maine Law Court's approach to economic reality in the case of joint employers would be more employee-favorable from the First Circuit's approach in Baystate.  I therefore reach the same conclusion under Maine law as under federal law, and conclude that Granite Bay New Hampshire, not the plaintiffs, is entitled to summary judgment on the plaintiffs' state law claim.

## II.   *Do the Defendants[25] Have a Federal Good Faith Reliance Affirmative Defense?*

29 U.S.C. § 259(a) creates a "good faith" defense to FLSA liability:

> [N]o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938 . . . if he pleads and proves that the act or omission complained of was *in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation*, of the agency of the United States specified in subsection (b) of this section [*i.e.*, the Administrator of the Wage and Hour Division of the Department of Labor], or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged.

Id. (emphasis added).   Courts have interpreted § 259(a) as creating a three-factor test requiring "that the act or omission complained of was (1) taken in good faith and was (2) in conformity with and (3) in reliance on a written administrative interpretation by a designated agency."   Cole v. Fresh Farm Poultry, Inc., 824 F.2d 923, 926 (11th Cir. 1987).

First, I recount additional undisputed facts pertinent to this motion.

---

[25] I refer to all the defendants as the motion does, but I am granting summary judgment to Granite Bay New Hampshire on the basis that it was not the plaintiffs' employer.

In May 2007, the United States Department of Labor sent a letter to Granite Bay Care's lawyer initiating a payroll audit and requesting access to documents.  Defs.' Statement of Material Facts ("DSMF II") ¶ 4 (ECF No. 64); Pls.' Statement of Material Facts in Opp'n to Defs.' Statement of Material Facts ("Pls.' Resp. II") ¶ 4 (ECF No. 70).  The Department of Labor's investigation did not focus on Adult Foster Care Providers, but focused instead on Respite Workers, a category different from these plaintiffs' positions.  Pls.' Additional Statement of Material Facts ("PASMF II") ¶ 1 (ECF No. 70); Defs.' Resp. to Pls.' Additional Statement of Material Facts ("Defs.' Resp. II") ¶ 1 (ECF No. 83).  Granite Bay Care provided all its employee payroll files and contracts for Direct Support Professionals and Adult Foster Care Providers.  DSMF II ¶ 5; Pls.' Resp. II ¶ 5.  The Department of Labor Wage and Hour Investigator reviewed the documents and asked questions about the employees' contracts, including the contracts of the Adult Foster Care Providers.[26]  DSMF II ¶ 6; Pls.' Resp. II ¶ 6.  The Investigator told Granite Bay Care's State Director that he was aware of the Adult Foster Care Provider business model because his sister received similar services.  DSMF II ¶ 8; Pls.' Resp. II ¶ 8.  During the course of the investigation, the Investigator interviewed Adult Foster Care Providers as well

---

[26] The plaintiffs assert that the substance of these questions, along with numerous other statements made by the Investigator and other Department of Labor representatives, is inadmissible hearsay.  Pls.' Resp. II ¶ 6.  However, the defendants make clear that these statements are not being offered for the truth of the matter asserted, but rather only to show that the statements were made and that Granite Bay Care relied upon them in good faith. Defs.' Reply to Pls.' Opp'n to Defs.' Mot. for Partial Summ. J. at 4-5 (ECF No. 85).  I therefore consider the statements for that limited purpose.

as Respite Workers.  DSMF II ¶ 12; Pls.' Resp. II ¶ 12.[27]  After reviewing Granite Bay Care's files during the 2007 investigation, the Investigator compiled a list of names and reviewed them with Granite Bay's State Director, specifically asking which named individuals were Adult Foster Care Providers.  DSMF II ¶ 9; Pls.' Resp. II ¶ 9.  The Investigator removed those names from the list of individuals who he believed were entitled to overtime.  Id.[28]  The individuals removed from the list worked both as Adult Foster Care Providers and as Direct Support Professionals.  DSMF II ¶ 10; Pls.' Resp. II ¶ 10.[29]  The Investigator did not raise any concerns over this dual role.  DSMF II ¶ 11; Pls.' Resp. II ¶ 11.  At a meeting on August 30, 2007, the Investigator met with Granite Bay Care's State Director and explained his findings, focusing on the Respite Workers.

---

[27] The plaintiffs deny this allegation and state that the investigation did not focus on Adult Foster Care Providers or their compensation, but rather on Respite Workers.  Pls.' Resp. II ¶ 12.  In fact, the parties agree that the investigation focused on Respite Workers, as stated above, but this fact alone does not create a dispute as to whether the Investigator interviewed Adult Foster Care Providers during the course of his investigation.

[28] The plaintiffs deny this allegation and state, "Defendant contends that several of the persons who made complaints to USDOL were Adult Foster Care Providers who were also plaintiffs in the private civil lawsuit against Granite Bay Care, and that USDOL did not prosecute their claims."  Pls.' Resp. II ¶ 9.  However, this allegation does not raise a dispute as to whether the Investigator reviewed the list and removed the names of Adult Foster Care Providers.  The plaintiffs also object to this evidence and argue that Granite Bay Care's State Director's testimony as to why the Investigator removed names from the list lacks a foundation.  However, the State Director testified that the Investigator "went down the list" with him and that he "ha[d] a discussion with [the Investigator] around why he was doing that" and that the Investigator "indicated that it was fine for the [Adult Foster Care Providers] to cover their own weekends, it was their home, they could—they could choose not to avail themselves of respite and, therefore, that they—that money should not be included in his assessment."  Robinson Dep. II 64:11-65:3 (ECF No. 64-1).  Because the Investigator's statements would be hearsay if offered for their truth, I consider them only for the fact that he made them as that might bear upon the defendants' good faith reliance.

[29] The plaintiffs deny this allegation and claim that the record cited does not support it, Pls.' Resp. II ¶ 10, but in the cited portion of his deposition, Granite Bay Care's State Director testified that all of the Adult Foster Care Providers at the time also worked as Direct Support Professionals, Robinson Dep. II 65:4-9 (ECF No. 64-1).  The plaintiffs' denial is therefore unsupported.

DSMF II ¶ 13; Pls.' Resp. II ¶ 13.  The Investigator also told the State Director that the Adult Foster Care Providers were "fine."  Id.

On September 17, 2007, the Investigator sent an e-mail to Granite Bay Care's lawyer and attached a Department of Labor opinion that discussed the "companionship exemption" to the FLSA and set forth factors to consider in determining whether a residence was a private home to which the exemption applied.  DSMF II ¶ 14; Pls.' Resp. II ¶ 14; PASMF II ¶ 10; Defs.' Resp. II ¶ 10. The Investigator concluded in the e-mail that the homes where Granite Bay Care's clients resided were not the private homes of the Respite Workers, so that the exemption did not apply to them.  PASMF II ¶ 9; Defs.' Resp. II ¶ 9. The last paragraph of this e-mail stated that Adult Foster Care Providers who did not use Respite services could have their Respite care payment considered as an additional foster care stipend:

> As I indicated at the meeting, my overtime back wage figures are subject to revision as circumstances warrant, such as for the instances [the State Director] mentioned with the adult foster care provider opting not to avail themselves of the respite care and instead being paid the respite care stipend themselves.  In that case, I will instead consider the respite care payment as an additional foster care stipend.

DSMF II ¶¶ 15-16; Pls.' Resp. II ¶¶ 15-16.  Granite Bay Care's lawyer forwarded the e-mail and attachment to the State Director, who read both the e-mail and the Department of Labor opinion.  PASMF II ¶ 8; Defs.' Resp. II ¶ 8.

On November 7, 2007, Granite Bay Care representatives, including its lawyer, met with Department of Labor representatives, including the Investigator and the Department of Labor District Director.  DSMF II ¶ 17; Pls.'

Resp. II ¶ 17.   The District Director reviewed the Investigator's previous determinations, and Granite Bay Care's lawyer asked the District Director to state in writing that the Adult Foster Care Provider model was acceptable. DSMF II ¶ 18; Pls.' Resp. II ¶ 18.   The District Director responded that the Department of Labor did not ordinarily do so, but that if Granite Bay Care sent such a letter, he would respond in writing if something in the letter were incorrect.   Id.

After the meeting, the Department of Labor issued a letter of findings, which made no findings regarding Adult Foster Care Providers.   DSMF II ¶ 19; Pls.' Resp. II ¶ 19.   Granite Bay Care's lawyer in turn sent a letter to the District Director to "memorialize our mutual understanding of DOL's investigation and outcome."   DSMF II ¶ 20; Pls.' Resp. II ¶ 20; PASMF II ¶ 19; Defs.' Resp. II ¶ 19.   The letter set forth Granite Bay Care's position on the Adult Foster Care Providers and stated: "The DOL's investigation did not focus on the [Providers] or hourly workers and found no violations with regard to the [Providers] or hourly workers."   DSMF II ¶¶ 20-21; Pls.' Resp. II ¶¶ 20-21. Granite Bay Care's State Director never received or was made aware of a Department of Labor response to the letter.   DSMF II ¶ 22; Pls.' Resp. II ¶ 22.[30] The Department of Labor sent follow-up e-mails seeking unrelated information from Granite Bay Care, but neither those e-mails nor a February 22, 2008

---

[30] The plaintiffs deny the defendants' blanket assertion that "[t]he DOL never responded to the statement in the letter."   DSMF II ¶ 22; Pls.' Resp. II ¶ 22.   The State Director testified only that he never received nor was made aware of a response.   Robinson Dep. II 74:22-75:2 (ECF No. 64-1).   Viewing the facts most favorably to the plaintiffs, I conclude that the defendants have shown only that the State Director was not aware of a response, not that there never was a response.

letter from DOL's District Director to Granite Bay Care's lawyer addressed or corrected the statement in the lawyer's letter regarding Adult Foster Care Providers.  DSMF II ¶¶ 23-24; Pls.' Resp. II ¶¶ 23-24.

In 2010 the Department of Labor initiated another investigation of Granite Bay Care's employment practices, and initially concluded that the company's Adult Foster Care Providers were due overtime payments.  DSMF II ¶ 27; Pls.' Resp. II ¶ 27.  At a meeting between Granite Bay Care and Department of Labor representatives, Granite Bay Care's State Director contended that the company had acted in good faith based on the Department of Labor's review in 2007, and that the Department of Labor had misled Granite Bay Care into believing that its compensation model for Adult Foster Care Providers was viable.  DSMF II ¶ 28; Pls.' Resp. II ¶ 28.  After a series of meetings between the Department of Labor and Granite Bay Care regarding the issue, the Department of Labor took no further action.  DSMF II ¶ 30; Pls.' Resp. II ¶ 30.

With that factual background, I turn to the requirements of the good faith defense.  The defendants argue that the DOL Investigator's e-mail dated September 17, 2007 was a "ruling" to which they conformed in good faith reliance, thus qualifying them for an affirmative defense under § 259(a).[31]  The

---

[31] In their motion, the defendants relied on the e-mail, their discussions with DOL representatives, and their letter to DOL.  See Defs.' Mot. for Partial Summ. J. at 10-11 (ECF No. 63).  But in their reply brief they made clear that they do not argue that the Department of Labor's failure to respond to the lawyer's letter stating Granite Bay's understanding of the findings against it represented a "ruling."  See Defs.' Reply to Pls.' Opp'n to Defs.' Mot. for Partial Summ. J. at 5 (ECF No. 85).  Although the discussions and the letter might bear on good faith, they cannot fulfill the requirement that the ruling or interpretation be written.  With
*(continued next page)*

plaintiffs respond both that the e-mail does not constitute a "ruling" under § 259(a) and that in any event, Granite Bay Care did not rely on it in good faith. Because I conclude that the Investigator's e-mail does not fit section 259(a) as a ruling or interpretation, I need not rule on the good faith issue.

Courts are divided on whether a DOL Investigator's interpretation can ever constitute a "ruling, approval, or interpretation, of the *agency*" (emphasis added) within the meaning of § 259(a).  The Department of Labor's view is that

> where the "agency" whose regulation, order, ruling, approval, interpretation, administrative practice or enforcement policy may be relied on is confined to "the agency of the United States" specified in the section, the Act expressly limits the meaning of the term to the official or officials actually vested with final authority under the statutes involved. . . .  Furthermore, it appears from the statement of the managers on the part of the House accompanying the Conference Committee Report, that the term "agency" as appearing in the Portal Act was employed in this sense.  As there stated (p. 16), the regulations, orders, ruling, approvals, interpretations, administrative practices and enforcement policies relied upon and conformed with "must be those of an 'agency' and not of an individual officer or employee of the agency.  Thus, if inspector A tells the employer that the agency interpretation is that the employer is not subject to the (Fair Labor Standards) Act, the employer is not relieved from liability, despite his reliance in good faith on such interpretations, unless it is in fact the interpretation of the agency." Similarly, the Chairman of the Senate Judiciary Committee, in explaining the conference agreement to the Senate, made the following statement concerning the "good faith" defense.

---

particular respect to DOL's failure to contradict the letter from Granite Bay Care, Department of Labor regulations make clear that "[a] failure to act or a failure to reply to an inquiry on the part of an administrative agency is not a 'regulation, order, ruling, approval, or interpretation' within the meaning of" § 259.  29 C.F.R. § 790.17(f).  Moreover, to the extent that the plaintiffs seek overtime pay predating the alleged "ruling" in 2007, the defendants obviously cannot argue that they "relied" upon something that did not yet exist.  See 29 C.F.R. § 790.17(h) ("An employer does not have a defense under these two sections unless the regulation, order, ruling, approval, or interpretation, upon which he relies, is in effect and operation at the time of his reliance."); In re Cargill Meat Solutions Wage and Hour Litig., 632 F. Supp. 2d 368, 390 (M.D. Pa. 2008) (holding that defendant could not have "relied upon" an opinion letter issued four months after it made the policy decision in question).

> "It will be noted that the relief from liability must be based on a ruling of a Federal agency, and not a minor official thereof. I, therefore, feel that the legitimate interest of labor will be adequately protected under such a provision, since the agency will exercise due care in the issuance of any such ruling."

29 C.F.R. § 790.19(b).[32]  Several courts have held that the written approval of a Wage and Hour Investigator accordingly is not enough to establish a good faith defense under § 259(a).  See, e.g., Cusumano v. Maquipan Int'l, Inc., 390 F. Supp. 2d 1216, 1222 (M.D. Fla. 2005) ("[§ 259] requires reliance upon a written administrative interpretation from the Administrator of the Wage and Hour Division of the Department of Labor, but Defendants' Exhibit B was sent by a Wage and Hour Investigator, not the Administrator.  Further, this sort of correspondence does not constitute a written administrative interpretation." (citing district court cases from Colorado, Wisconsin, and Pennsylvania)).  I find the Cusumano reasoning persuasive.

On the other hand, the Eastern District of New York held in Mascol v. E & L Transp., Inc., 387 F. Supp. 2d 87, 100-01 (E.D.N.Y. 2005), that a letter signed by a Wage and Hour Investigator was a "ruling" within the ambit of § 259(a):

> Since the letter was issued by the Wage and Hour Division as a result of a specific official investigation, even though it was not a published formal statement, it qualifies as an official letter representing the position of the Wage and Hour Division and so it must be a "ruling" of an "Agency" as contemplated by the Portal Act.

---

[32] Section 790 is part of a subchapter setting forth "statements of general policy or interpretation not directly related to regulations," and sets forth the Wage and Hour Division's conclusions and interpretations of the Portal-to-Portal Act, "provid[ing] a practical guide to employers and employees as to how the office representing the public interest in enforcement of the law will seek to apply it."  29 C.F.R. § 790.1(c).

Id.  But in <u>Mascol</u>, the correspondence in question was a letter "issued from the Employment Standards Administration, Wage and Hour Division, DOL, and signed by" the Investigator, and it addressed squarely the FLSA violation at issue: "We believe your firm to be exempt from OT [overtime] under FLSA Reg. Section 13(b)17."  387 F. Supp. 2d at 91.  In contrast, the Investigator's e-mail here focused on Respite care providers and did not purport to state an Agency position, let alone a position on Adult Foster Care Providers.  The language upon which Granite Bay Care relies stated:

> As I indicated at the meeting, my overtime back wage figures are subject to revision as circumstances warrant, such as for the instances [Granite Bay's State Director] mentioned with the adult foster care provider opting not to avail themselves of the respite care and instead being paid the respite care stipend themselves.  In that case, I will instead consider the respite care payment as an additional foster care stipend.

DSMF II ¶¶ 15-16; Pls.' Resp. II ¶¶ 15-16.  This statement is too slender a reed to meet the definition of either an "interpretation" on the topic ("a statement 'ordinarily of an advisory character, indicating merely the agency's present belief concerning the meaning of applicable statutory language' . . . includ[ing] bulletins, releases, and other statements issued by an agency which indicate its interpretation of the provisions of a statute," 29 C.F.R. § 790.17(c)), or a "ruling" ("an interpretation made by an agency 'as a consequence of individual requests for rulings upon particular questions,'" 29 C.F.R. § 790.17(d)).

The defendants argue that "if there was any issue or concern with payment of adult foster care providers on an hourly basis or with the potential payment of overtime, there would have been no reason for this statement to be

made." Defs.' Mot. for Partial Summ. J. at 8 (ECF No. 63).  Perhaps so, but that does not turn the e-mail into an interpretation or a ruling, and neither does the District Director's silence in response to Granite Bay's lawyer's letter or DOL's 2010 decision not to proceed.   See 29 C.F.R. § 790.17(g) ("If for example, the agency declines to express an opinion as to the application of the law in a particular fact situation, the agency is refraining from interpreting the law rather than giving an interpretation."); De Luna-Guerrero v. N.C. Grower's Ass'n, Inc., 370 F. Supp. 2d 386, 392 (E.D.N.C. 2005) ("[I]t is not enough for the agency to state that it will not express an opinion." (citing 29 C.F.R. § 790.17(g))).

As a result, I deny the defendants summary judgment on their good faith affirmative defense to the federal claim.

### III.   The Plaintiffs' Motion for Summary Judgment of Liability on the State Law Claim

#### A.   Supplemental Jurisdiction

It is well established that under the supplemental jurisdiction statute there is subject matter jurisdiction to adjudicate any state claim that forms part of the same case or controversy as the federal claim.  28 U.S.C. § 1367; Pagan–Colon v. Walgreens, 697 F.3d 1, 18 n. 12 (1st Cir. 2012).  The parties agree that appropriate compensation for the work under the Fair Labor Standards Act ("FLSA") claim involves the same work, conducted in the same place, as the Maine law wage and hour claims.  The defendants challenge my exercise of supplemental jurisdiction over the state claims in this case only if I grant them summary judgment on the FLSA claim.  Because I have not granted

summary judgment on the federal claim against all the defendants, I will continue to exercise jurisdiction over the state law claims under 28 U.S.C. § 1367.

### B.    Statute of Limitations

The plaintiffs request that summary judgment be granted on the defendants' affirmative defense of the statute of limitations.[33]   I am not sure why this issue is still in play. The parties agree that Maine's general six-year statute of limitations applies to this case.   The defendants' liability under Maine wage and hour laws can extend only as far back as the beginning of each plaintiff's employment. The defendants say that date is less than six years in each case and the plaintiffs have not disagreed.   Because none of the plaintiffs worked for the defendants for more than six years before filing their respective complaints,[34] I grant summary judgment to the plaintiffs on the statute of limitations defense with regard to liability under Maine law.

---

[33] I refer to all the defendants as the motion does, but I am granting summary judgment to Granite Bay New Hampshire on the basis that it was not the plaintiffs' employer, and to Mumpini and Alicea on the basis that Maine law does not allow for individual liability.

[34] Kayi Affo and Andre Folikoue Teko and Sharon McCarron filed their initial complaint on December 16, 2011, Sharon Fairbanks filed her initial complaint on April 9, 2012 and Jessica Palmer was added as a plaintiff when Fairbanks filed a First Amended Complaint on June 9, 2012.

## C.      Employee/Independent Contractor[35]

The Maine wage-and-hour statute sets the minimum wage and overtime standards for Maine employees.   Under Maine law, employers are generally required to compensate their employees at or above the stated minimum wage for the first 40 hours of work and at one and one-half times the employee's regular wage for time over 40 hours.   26 M.R.S.A. § 664 (1) & (3).   Although certain exemptions exist, the parties agree that none of those exemptions applies to this case.   The issue is whether the plaintiffs, when working as Adult Foster Care Providers, were properly classified as independent subcontractors in being paid a stipend without regard to minimum wage or overtime, rather than as Granite Bay Care employees.   If not, damages will follow.

---

[35] The defendants assert that the record fails to set forth individualized circumstances covering each aspect of the plaintiffs Kayi Affo, Sharon Fairbanks and Jessica Palmer's relationship with Granite Bay Care to demonstrate the employment relationship as a matter of law.   Defs.' Opp'n to Pls.' Mot. for Summ. J. at 22 (ECF No. 78).   With respect to the plaintiffs Andre Folikoue Teko and Sharon McCarron, the defendants assert that although the evidentiary record provides specific factual  evidence related to their employment relationship with Granite Bay Care, there remain issues of fact that prevent summary judgment.   Id.   The defendants rely on two cases to support the position that "individual plaintiffs cannot rely solely on evidence of a pattern or practice to establish individual instances of discrimination."   Id. at 11 (citing Ramirez v. DeCoster, 194 F.R.D. 348, 362 (D. Me. 2000), and Smith v. Northeastern Ill. Univ., 2002 U.S. Dist. LEXIS 4498, at *12-13 (N.D. Ill. Mar. 19, 2002)).

Although the defendants' cases support the requirement of individualized treatment in discrimination cases where individual plaintiffs have experienced different conditions and treatment, they do not support requiring separate treatment of each plaintiff in this case, where the material facts do not include individualized evidence.   Except for a few discrete statements of fact proffered by the plaintiffs, on which I have not relied, the record shows that Granite Bay Care treated Adult Foster Care Providers and Direct Support Professionals in a uniform way.   This standardization is found in the stipulated record, the Adult Foster Care Provider and Direct Support Professional contracts, and the defendants' evidentiary record, including the affidavit of Kenneth Olson, who served as the Director of Operations for Granite Bay Care from 2009 through 2012, and the depositions of Gregory Robinson, who served as the State Director for Granite Bay Care from 2004 through 2011.

### *Eight-Factor Test*

I examined the Maine law independent contractor/employee issue recently in Scovil v. FedEx Ground Package Sys., Inc., 886 F. Supp. 2d 45, 51-52 (D. Me. 2012).  I concluded there that the eight factors from Murray's Case, 154 A. 352 (Me. 1931), determine the nature of the relationship under Maine wage and hour laws.  I rely upon the Scovil reasoning without revisiting it.[36]

The Murray's Case relationship test teaches consideration of the following factors:

> (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer.

Scovil, 886 F. Supp. 2d at 52 (quoting Murray's Case, 154 A. at 354).  Although no one factor is controlling, the principal test of the relationship is "the right to control."  Scovil, 886 F. Supp. 2d at 52.  But the Law Court has also clarified that when a workers' protective statute is being interpreted (as it is here), more attention should be given to two of the eight factors: the nature of the work (Murray's Case's "independent nature of his business or his distinct calling") and its importance to the employer's business (Murray's Case's "whether the work is part of the regular business of the employer").  Legassie v. Bangor Pub.

---

[36] Although the parties cite a number of federal cases, including Rutherford   Food  Corp.  v. McComb, 331 U.S. 722 (1947), I have not found it necessary to address them, given the Maine Law Court's own extensive attention to this state law topic.

Co., 741 A.2d 442, 445 & n.4 (Me. 1999).  With these standards in mind, I consider the relationship between the parties in this case.

### (1)   *Existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price*

The parties agree that Providers entered into contracts with Granite Bay Care in which they agreed to assume responsibility for the care of a disabled individual who was in need of mental health services.  Stipulated Facts ¶¶ 2, 5, 40, 41, 43.  The contract required that the Provider be responsible for the care of the client twenty-four hours per day, five days per week.  Stipulated Facts ¶ 2.

The contract required that the Provider provide services certain hours of each week.  McCarron Contract at 836-37, 847, 849.  The services that were provided under the contract were compensated in the form of a stipend, paid bimonthly or monthly.  Stipulated Facts ¶ 5.  The stipend was further broken down into a per diem amount to facilitate the calculation of an adjusted stipend if the Provider were absent on a day in which he or she otherwise would have been providing care.  Stipulated Facts ¶ 6; McCarron Contract at 847, 849.  In fact, the plaintiffs' stipends were reduced on a per diem basis when they were absent for a day or more and Respite coverage needed to be obtained.  Stipulated Facts ¶¶ 6, 36; McCarron Contract at 847.  The contractual "stipend" was directly proportional to the number of days the Provider worked.  In other words, this was payment for time worked—like a wage—and not payment for a service whereby the Provider could make a profit by performing more quickly.

This factor favors the finding of an employee relationship.

### (2)    *Independent nature of the business or his distinct calling*

The parties agree that the Providers did not operate an independent business or have a traditional "calling," although some had experience in caring for disabled individuals.  Stipulated Facts ¶ 10.  Indeed, Granite Bay Care provided training for the Providers.  Stipulated Facts ¶¶ 13, 22, 23.  The Providers did not ordinarily perform other services for other entities during the time of their employment with Granite Bay Care.  Stipulated Facts ¶ 35.[37]

This factor favors the finding of an employee relationship.

### (3)    *Employment of assistants with the right to supervise their activities*

The contract did not permit the Providers to hire assistants or substitutes, but instead required Granite Bay Care's approval of any Respite Care provider identified by the Provider.   McCarron Contract at 848.[38] Providers did not supervise Respite Workers.  Pls.' Statement of Material Facts ("PSMF III") ¶ 5 (ECF No. 57); Defs.' Resp. to Pls.' Statement of Material Facts ("Defs.' Resp. III") ¶ 5 (ECF No. 75).  If a Provider did not like the manner in which a Direct Support Professional or a Respite Care Worker treated the

---

[37] The plaintiffs assert that because the Providers' job duties required them to engage only in ordinary tasks such as cooking, cleaning and driving, and needed no specialized education, the Providers did not have a distinct "calling" or business.  Pls.' Mot. for Partial Summ. J. at 11 (ECF No. 56).  I do not find this argument based on the nature of the work persuasive.  Many businesses operating as independent contractors provide services where they cook or clean or drive.

[38] The defendants complain that only two plaintiffs provided affidavits that they were not allowed to hire assistants.  Defs.' Resp. in Opp'n to Pls.' Mot. for Summ. J. at 17 (ECF No. 78).  But there is no suggestion that the Providers' contract language did not apply to all these plaintiffs.  Defs.' Resp. to Pls.' Statement of Material Facts ("Defs.' Resp. III") ¶¶ 4, 5 (ECF No. 75).  Affidavits were therefore unnecessary on this topic unless there was evidence that Granite Bay Care and the plaintiffs ignored this provision.

disabled individual or the manner in which they performed their jobs, the Provider complained to Granite Bay Care's management about those employees.  Id.

This factor favors the finding of an employee relationship.

### (4)   Obligation to furnish necessary tools, supplies, and materials

Providers were required to come equipped with a cell phone, a vehicle and a computer to assist in supporting and caring for their assigned individuals, McCarron Contract at 843 ¶ h, no specialized tools.  They were also responsible for providing bedroom furnishings for their own rooms.  McCarron Contract at 843 ¶ g; Stipulated Facts ¶ 17.  But they did not have to provide the home, food for the clients, heat, insurance or utilities.  PSMF III ¶ 6; Defs.' Resp. III ¶ 6.  Granite Bay Care leased the homes in which they provided services.  PSMF III ¶ 7; Defs.' Resp. III ¶ 7.  Moreover, they did not have to pay any of the costs of maintaining the homes.  PSMF III ¶ 8; Defs.' Resp. III ¶ 8.  They informed Granite Bay Care of needed repairs.  Stipulated Facts ¶ 18.  Granite Bay Care or the landlord made all the repairs.  Id.  Bills for the maintenance of the homes went to Granite Bay Care's corporate office to be processed and paid.  Stipulated Facts ¶¶ 19-20.

Nothing about the tools, supplies and materials suggests that this is an independent contractor relationship, although this factor does not lead strongly in either direction.

### (5)     *Right to control the progress of the work except as to final results*

With respect to control "[i]t is not the fact of *actual* interference with the control, but the *right* to interfere, that makes the difference between an independent contractor and a servant or agent." Murray's Case, 154 A. at 354 (emphases added) (citation omitted).   The plaintiffs assert that Granite Bay Care had the right and power under its Adult Foster Care Provider contract, as well as under the disabled client's "Person Centered Plan," to direct and control their work.   Granite Bay Care disagrees.   Although the unusual work setting here may have made *actual* control on a continuous basis difficult, I conclude that Granite Bay Care nevertheless retained the *right* to control the plaintiffs.

The Adult Foster Care Provider contract provided specific responsibilities and obligations for the Provider.   Stipulated Facts ¶ 21; McCarron Contract. However, the parties have stipulated that the contract covered only part of the services and/or work performed to provide disabled individuals support and care during each week.   Stipulated Facts ¶ 1.   Granite Bay Care instructed Providers on how their role should be performed and trained Providers on how to work with disabled individuals.   Stipulated Facts ¶ 22.   Under the contract, Granite Bay Care not only directed the hours of the work but also required Providers to request leave if they wanted to be absent from the home that Granite Bay Care provided for the client.    Stipulated Facts ¶ 2; McCarron Contract at 843, 848.   Granite Bay Care set and enforced rules regulating the conduct of the Providers in the home, such as prescribing who could authorize visitors to the home and prohibiting the possession of alcohol, weapons or

pornography.  Stipulated Facts ¶ 26; McCarron Contract at 843.  The contract required Providers to direct questions about agency matters to Granite Bay Care's Program Manager.  McCarron Contract at 838, 843.  In addition, Granite Bay Care reserved the right to terminate a Provider's contract at any time without cause and without notice.  Stipulated Facts ¶ 8.  Providers, on the other hand, were required to give 90 days' notice before ending the contract. Stipulated Facts ¶ 9.  A Provider's failure to provide the required notice of termination could "impact the individual's employment status in other [Granite Bay Care] programs" if he or she were so employed.[39]  Id. Granite Bay Care required Providers to provide all required documents and a monthly report to its Program Manager.  McCarron Contract at 843 ¶ c.

Each client that Granite Bay Care served had his or her own unique needs.  In order to meet those needs a detailed Person Centered Plan was developed.  A team consisting of the legal guardian for the disabled individual, a representative of the State of Maine, staff from Granite Bay Care and the Provider generated the Plan.  PSMF III ¶ 12; Defs.' Resp. III ¶ 12.  The Plan had to be approved by the State and the guardian, and then was enforced by Granite Bay Care.  PSMF III ¶ 13; Defs.' Resp. III ¶ 13.  The Providers had to follow the Plan in teaching daily living skills and in the general delivery of services to the disabled client.  McCarron Contract at 836 ¶ c.  The Providers stayed in regular contact with the legal guardian for the disabled client.  Defs.'

---

[39] Direct Support Professional and Respite Care employees who failed to deliver the requisite quality of services could be terminated immediately.  As a consequence of being terminated as an employee, if they served as Adult Foster Care Providers, their contract could also be terminated.  Stipulated Facts ¶ 25.

44

Additional Statement of Material Facts ("DASMF III") ¶ 29 (ECF No. 75); Pls.'
Resp. to Defs.' Additional Statement of Material Facts ("Pls.' Resp. III") ¶ 29
(ECF No. 82).   The Provider was the connection to the legal guardian and
attended all meetings and provided the detailed update on what the disabled
individual had done and how the client was progressing.   DASMF III ¶ 31; Pls.'
Resp. III ¶ 31.

Granite Bay Care acknowledges that it monitored the Providers'
performance under the contract, DASMF III ¶ 34; Pls.' Resp. III ¶ 34, but it
asserts that its focus was on the ultimate *results* of the Providers' work rather
than on how the results were achieved.   It cites <u>Legassie</u>, 741 A.2d at 444, for
support of its argument that the Providers were therefore independent
contractors.   <u>Id</u>. ("The right to control the 'details of the performance,' present
in the context of an employment relationship, must be distinguished from the
right to control the result to be obtained, usually found in independent
contractor relationships." (citation omitted)).   Granite Bay Care says that
although it tailored care to the individual client and provided individualized
mental health services, the Providers were provided "unfettered discretion in
how they performed their duties."   Defs.' Opp'n to Pls.' Mot. for Summ. J. at 18
(ECF No. 78).   To support this assertion, Granite Bay Care points out that a
Provider made hundreds of decisions each day:

> when to wake the consumer, when the consumer should
> get dressed, what the consumer should eat for the day,
> when and how to prepare and cook meals, how to involve
> the consumer in those activities, what leisure activities the
> consumer can or should engage in, when the consumer can
> watch television and which shows he or she may watch,

> what and when the consumer can read, when the consumer
> can have time to relax and what the consumer will do
> during that period, what games the consumer can play,
> topics to discuss with the consumer, when telephone calls
> can be made, when and what to clean in the house, when
> to perform hygiene related functions, when, where and how
> long to go out for walks or drives or to attend church or
> activities, what activities to participate in, when to prepare
> for bed and to go to bed, how to provide guidance and
> instruction to the consumer on daily activities such as
> those described above, how and when to reinforce
> instruction and lessons that were experienced during the
> course of the day, how to continue to assist the consumer
> with their growth and development, and how, when and
> why to restrain and/or discipline the consumer for his or
> her conduct. In addition, the [Provider] is responsible for
> modeling appropriate behavior throughout the time he or
> she spends with the consumer.

DASMF III ¶ 25; Pls.' Resp. III ¶ 25.   Because of the mental health issues

experienced by its disabled clients, Granite Bay Care explains that each of the

"events" described above was much more significant than it might otherwise

seem to an individual not involved in the delivery of mental health services.

According to Granite Bay Care, this individualized decision-making by the

Providers throughout the day and night was critical to the development of that

client and was the essence of the responsibilities performed by the Providers

under the contract.   It says that Providers used their own judgment and

discretion and were given the freedom to perform their duties of caring for an

individual client on an hourly and daily basis.   Granite Bay Care was not

present in the home with the Providers and, it says, because of the need for

personalized care, did not micromanage the Providers on a daily or weekly

basis.

Granite Bay Care's arguments may show that constant monitoring of Providers was impractical, but they do not show that Granite Bay Care surrendered the *right* to control what Providers did.   Many workers conventionally categorized as employees are not and cannot be supervised on a moment-by-moment or even hour-by-hour basis (consider teachers or coaches), especially in today's world of telecommuting.   But that does not mean that their employer lacks the *right* to control them, only the opportunity.   Even without intervening in the details of how the Providers performed each task or job duty, Granite Bay Care controlled the work of the Providers.   Given the terms of the contract and the Plans that structured and ordered Providers' work, the ultimate supervision and oversight of their work by Granite Bay Care and the training provided by Granite Bay Care, the Providers did not have the right to control their own work.   They were not given any contractual discretion to deviate from contracts or Plans.   They were subject to the direction and supervision of Granite Bay Care.

This factor favors the finding of an employee relationship.

### (6)   *Time for which the workman is employed*

The Provider contract was for a one-year term.   McCarron Contract at 835.   In practice, Providers signed a new contract each year they served and all were employed for more than one year.   Sharon McCarron Aff. ¶ 5 (ECF No. 57-3); Andre Folikoue Teko Aff. ¶ 5 (ECF No. 57-4); Kayi Affo Contracts (ECF No. 68-2; Jessica Bradbury Palmer Contracts (ECF No. 68-3); Sharon Fairbanks Contracts (ECF No. 68-4); Sharon McCarron Contracts (ECF No. 68-5); Andre

Folikoue Teko Contracts (ECF No. 68-6).  Granite Bay Care could terminate them without cause and without notice, but the Providers had the obligation to give advance notice if they left Granite Bay.  Stipulated Facts ¶¶ 8-9.

The plaintiffs assert that the "prolonged duration" of the employment indicates that they were employees.  The defendants cite Owen v. Royal Industries, Inc., 314 A.2d 60, 62 (Me. 1974), a workers' compensation case, to confirm that independent contractors can in fact be engaged on a long-term basis.  Defs.' Opp'n to Pls.' Mot. for Summ. J. at 20 (ECF No. 78).  Owen does recognize that proposition, albeit in passing.

I conclude that this factor does not favor either categorization of the relationship.

### (7)   *Method of payment—by time or by job*

Granite Bay Care compensated the Providers according to a fixed fee for a month.  Defs.' Opp'n to Pls.' Mot. for Summ. J. at 20-21 (ECF No. 78).  But there was no way the Providers could complete the "job" in a shorter time. Instead, as discussed above, Granite Bay Care *reduced* a Provider's stipend for each missed day of work.  The stipend also varied according to the number of days in the month. McCarron Contract at 849 (semi-monthly stipend breakdown).

The per diem reduction weighs in favor of finding an employee relationship.

### *(8)* *Whether the work is part of the regular business of the employer*

The work that Providers did was not only "*part* of the regular business of" Granite Bay Care, it was central to its business.  Granite Bay Care's mission stated: "Granite Bay Care (Care) is a locally owned and operated human service agency providing intensive clinical, nursing, residential, and community based services to adults with cognitive and physical disabilities, in a growing number of locations spanning North to South, Bangor to Berwick."  Stipulated Facts ¶ 39.  Granite Bay Care accomplished this mission through engaging persons in various positions including Providers and Direct Support Professionals. Stipulated Facts ¶ 41.  Providers worked in cooperation with the Direct Support Professionals doing very similar work at different times of the day. Together they were an integral part of the mission that Granite Bay Care chose: the care and protection of developmentally and physically disabled people in a home-based setting.  Stipulated Facts ¶¶ 3, 14, 39-41.  It is an admirable mission, but to say that these Providers were independent contractors would mean that Granite Bay Care contracted out the heart of its business.

This factor favors employee status.

\* \* \* \* \*

I conclude that none of the <u>Murray's Case</u> factors supports independent contractor status, and that most of them favor employee status.  The factors of special importance (according to <u>Legassie</u>) in worker protection cases such as this—(2) the nature of the work and (8) its relation to the employer's business— strongly favor employee status.  The factor emphasized in tort liability cases—

(5) right to control—also strongly favors employee status.  On this record and under Maine law, a factfinder could not find that the Providers were independent contractors, but only that they were employees. Therefore, the plaintiffs are entitled to summary judgment that Granite Bay Care is liable on the Maine state law claim for violation of Maine's wage and hour statute in treating these employees as independent contractors.

**CONCLUSION**

As a result of all my rulings, summary judgment shall be entered in favor of Granite Bay Connections, Inc. (the New Hampshire nonprofit) on all the plaintiffs' claims, and in favor of Kasai Mumpini and Caroletta Alicea on the state law claims.  Summary judgment on liability shall be entered in favor of the plaintiffs on their Maine state law claim against Granite Bay Care, Inc.  The amount of damages on that claim, as well as liability on the federal law claim (including that of Mumpini and Alicea), remain for trial.

**SO ORDERED.**

**DATED THIS 30TH DAY OF MAY, 2013**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**